# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

THOMAS LEE LEDBETTER, II,          )
                                   )
      Plaintiff,          )
                                   )
v.                                 )          Case No. 12-00393-CV-W-NKL
                                   )
MICHAEL J. ASTRUE,                 )
COMMISSIONER OF                    )
SOCIAL SECURITY,                   )
                                   )
      Defendant.          )

## ORDER

Before the Court is Plaintiff Thomas Lee Ledbetter, II's Social Security Complaint [Doc. #1]. This case involves a claim for Disability Insurance benefits under Title II and Title XVI of the Social Security Act., 42 U.S.C., §§ 401, *et seq*. Mr. Ledbetter contests the Defendant's findings that he is not disabled. For the following reasons, the Court AFFIRMS the decision of the Administrative Law Judge.

## I.     Background

Mr. Ledbetter filed an application for SSA disability insurance and SSI benefits on June 18, 2008. He alleges an inability to work beginning December 7, 2007, due to hypertension, left ventricular hypertrophy, major depressive disorder, generalized anxiety disorder, history of thyroid cancer, and alcoholism. His claim was denied by Administrative Law Judge ("ALJ") Mark Dawson. The Appeals Council declined review, and Mr. Ledbetter filed an action in this Court.

1

## A. Medical Record

On October 1, 2006, Mr. Ledbetter was admitted to St. Luke's Hospital for congestive heart failure, acute renal failure, and anemia. Mr. Ledbetter complained of shortness of breath, abdominal bloating, swelling in his lower extremities, high fever, chills, nausea, vomiting, and diarrhea. He stated that his symptoms had begun a month before, at which time he had been drinking half a fifth of whiskey a day. Treating physician Dr. Sally Ling attributed the acute renal failure to Mr. Ledbetter's extensive use of over-the-counter anti-inflammatory medicine, including Aleve and Motrin, to self-medicate for his symptoms. During consultation, Dr. Ling noted that Mr. Ledbetter had a history of alcoholism and had been in rehabilitation programs in the past, but that Mr. Ledbetter stated he had not been drinking for the past month. Mr. Ledbetter's heart failure was resolved with treatment for iron deficiency through a blood transfusion, and he was discharged on October 4, 2006.

On May 21, 2008, Mr. Ledbetter was admitted to North Kansas City Hospital and treated by Dr. Steven Bowlin and Dr. Sarah Hon. Mr. Ledbetter and his mother reported that Mr. Ledbetter had become hot, sweaty, and nauseas, begun shaking uncontrollably, and passed out. Mr. Ledbetter stated that he had been drinking more than a pint of alcohol per day but had stopped drinking several days prior to the episode. Both doctors attributed the seizure to potential alcohol withdrawal. Dr. Hon noted that Mr. Ledbetter explained that he had been under psychiatric care in the past and had tried psychiatric medications such as Xanex with no effect, and that drinking was the only thing that

helped control his racing thoughts. Dr. Hon wrote, "Clearly, he needs treatment of his alcoholism and long-term management of his psychiatric problems." [TR-315].

On May 23, 2008, Mr. Ledbetter was seen by Dr. Howard Rosen for a thyroid checkup. Mr. Ledbetter related that his thyroid had been removed due to cancer in 1991, but that he often forgot to take his thyroid medication. The examination revealed that the thyroid gland was no longer visible, but that a small nodule was apparent in each thyroid bed; however, Dr. Rosen stated this finding was non-specific. On May 23, 2008, Mr. Ledbetter also underwent an echocardiogram, which revealed moderate to severe thickening of the left ventricle of the heart, but otherwise indicated Mr. Ledbetter's heart functioning was normal.

On June 19, 2008, Mr. Ledbetter was seen by Tri-County Mental Health Services for severe anxiety, depression, and alcohol dependency. Mr. Ledbetter reported having tried to "drink himself to death" 6-8 weeks prior, and reported that his most recent drink had been three weeks prior. He was placed on "high risk to self" status, and the intake therapist noted that "[o]ver six months of treatment will be needed." He was given a Global Assessment of Function ("GAF") score of 40.[1] [TR-339].

---

[1] "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." *Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (internal quotes omitted). A GAF between 31-40 reflects "Some impairment in reality testing or communication… OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," while a GAF of 41-50 reflects "Serious symptoms (e.g. suicidal ideation)… OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 1994) (DSM–IV). *See also Oslin v. Barnhart*, 69 F. App'x 942, 947 (10th Cir. 2003); *Golubchick v. Barnhart*, 2004 WL 1790188 at *4 (E.D.N.Y. Aug. 9, 2004).

3

On July 2, 2008, Dr. Zafar Mahmood at Tri-County conducted an initial psychiatric evaluation of Mr. Ledbetter. Dr. Mahmood diagnosed Mr. Ledbetter with generalized anxiety disorder, alcohol dependence, and mood disorder. He noted that Mr. Ledbetter experienced episodes of aggression and had been fired from his job as a welder due to threatening a coworker. Mr. Ledbetter informed Dr. Mahmood that he had abused alcohol from a young age but that he had not drunk alcohol for the past month. Mr. Ledbetter also reported that he had trouble finding medications that worked. Dr. Mahmood noted that Mr. Ledbetter had "somewhat grandiose ideation," and that his "insight and judgment is fair but not regarding his alcoholism." [TR-333]. Dr. Mahmood assessed Mr. Ledbetter's GAF score as 55, indicating that Mr. Ledbetter exhibited moderate mental health symptoms and/or moderate difficulty in social or occupational functioning. Dr. Mahmood took Mr. Ledbetter off Librium and started him on Depakote and Tofranil.

On July 10, 2008, Mr. Ledbetter reported via phone that he had been experiencing side effects from the Depakote and Tofranil, including vomiting, blurred vision, and trouble walking in a straight line. Mr. Ledbetter stated he felt better on Librium, which he had previously been prescribed for his drinking problem. Dr. Mahmood discontinued Depakote and Tofranil and prescribed Invega.

On July 11, 2008, Mr. Ledbetter, accompanied by his mother, was seen at Tri-County by Nurse Roberta Dean. Mr. Ledbetter reported vomiting blood, having migraines, feeling constipated, sleeping excessively, not eating, and feeling weak and dizzy. Although Nurse Dean suggested that these problems may be medical and

4

recommended Mr. Ledbetter go to the ER, Mr. Ledbetter and his mother insisted that they were side effects from the medications. Nurse Dean asked Mr. Ledbetter to sit in the lobby while she discussed the treatment plan with Dr. Mahmood, who decided to cease medication for a few days before beginning Invega, but when Nurse Dean went to inform Mr. Ledbetter of this decision, he and his mother had gone.

On July 18, 2008, Mr. Ledbetter returned to Tri-County. Dr. Mahmood noted that Mr. Ledbetter appeared alert and oriented and had no suicidal ideation. Mr. Ledbetter complained that he was not sleeping well, felt paranoid and anxious in social situations, and was somewhat depressed, and reported that he had not used alcohol for the past month. Dr. Mahmood prescribed Invega.

On July 21, 2008, Mr. Ledbetter was seen at the Platte County Health Department for renewal of his blood pressure medication, Lisinopril. On August 4, 2008, he was seen again for blood pressure, which was still high, and Atenolol was added to his prescriptions.

Mr. Ledbetter saw psychiatrist Dr. Joyce Arnold at Tri-County for counseling weekly from July 2008 through November 2008. On July 24, 2008, Mr. Ledbetter communicated that he felt depressed, paranoid, and anxious about not having a job, and that he was having trouble sleeping at night. Dr. Arnold noted that his main anxiety seemed to come from his financial troubles. She also noted that Mr. Ledbetter "has had problems with alcohol" and that he said he drinks "to stop the depression and anxiety." On August 7, 2008, Dr. Arnold reported that Mr. Ledbetter "is still depressed and does not do anything for himself." [TR-364]. She noted that Mr. Ledbetter has no hobbies

5

and does not leave the house, and that he is not comfortable in public or with people he does not know. On August 29, 2008, Dr. Arnold noted that Mr. Ledbetter was still isolating himself, and that his depression had not eased and he felt the medication was not working. She counseled client to "find things to do and get out to help overcome some of this depression. She wrote, "At this time it would be difficult for him to keep a job. He does not function well around others." [TR-364].

On September 11, 2008, Dr. Arnold noted that Mr. Ledbetter "is fearful of looking for a job as he is afraid he will not be able to keep it," but that he "will begin to look for employment and try to get out and exercise." [TR-431]. On September 18, 2008, she noted that Mr. Ledbetter had applied for disability because "[h]e believes he is unable to work at this time," but that "[h]e will continue to try to find a job part time to get him out of the house and doing something." She also noted that Mr. Ledbetter "is under pressure from his mother to get a job and help around the house." [TR-431]. On September 25, 2008, Mr. Ledbetter reported that his mother "is getting quite persistant [sic] about his finding employment and helping with the finances at home." Dr. Arnold encouraged Mr. Ledbetter to look for part-time work. On October 9, 2008, Dr. Arnold noted that it did not seem Mr. Ledbetter was trying to find employment, and that he feared his thyroid cancer would return. On October 16, 2008, Dr. Arnold reported continued tension between Mr. Ledbetter and his mother over his lack of work and wrote that Mr. Ledbetter "will get applications and see what he can do." [TR-431] On October 23, 2008, she wrote that Mr. Ledbetter "must show an effort at finding a job. Encouraged him to get out and do this." On November 6, 2008, Mr. Ledbetter reported that his mother had told

him to move out, and that he would go live with his girlfriend.  On November 6, 2008,

Dr. Arnold filled out a form stating Mr. Ledbetter was discharged from counseling.  Dr.

Arnold wrote that his condition had "moderately improved."  She noted that when he

entered counseling, he was depressed and anxious due to being unemployed, but that he

currently wants to find a job.  She recommended a recovery group for anxiety and AA.

[TR-429].

Mr. Ledbetter was seen at Platte County Health on October 6, 2008, for

hypertension.  He was seen again on February 9, 2009, for an ankle injury, during which

he also complained of lower back pain.  He was seen for lower back pain and medication

refills on June 12, 2009.  On June 29, 2009, Mr. Ledbetter was prescribed Vicodin and

physical therapy after x-rays revealed mild osteoarthritis of the lumbar spine.

Mr. Ledbetter pursued mental health treatment at Johnson County Mental Health

from August 2009 through October 2009.  On August 17, 2009, therapist Michael Peters

recorded on Mr. Ledbetter's intake exam that Mr. Ledbetter reported depression, lack of

motivation, trouble sleeping, and being easily irritated.  Mr. Ledbetter informed Mr.

Peters that he had gotten drunk two months previously and been charged with disorderly

conduct, but that he had been sober since; that both his father and mother were

alcoholics; and that he had been sexually abused as a child.  Mr. Ledbetter also informed

Mr. Peters that he was unable to work as a welder anymore because of pain in his back,

neck, and hips.  Mr. Peters assessed Mr. Ledbetter's Global Assessment of Function

("GAF") score as 50, indicating that Mr. Ledbetter exhibited serious mental health

symptoms and/or a serious impairment in social or occupational functioning.  Mr. Peters

7

diagnosed Mr. Ledbetter with mood disorder, anxiety disorder, and alcohol dependence. However, Mr. Peters noted that Mr. Ledbetter did not meet the criteria for the presence of a severe and persistent mental illness. [TR-467].

At his therapy appointment on September 9, 2009, Mr. Ledbetter stated that he was unable to work because of physical and mental problems, and denied the need for a twelve-step alcohol abuse program. Mr. Peters wrote that Mr. Ledbetter "lacks insight regarding the need for 12 step support" but that Mr. Ledbetter had been maintaining sobriety. [TR-463]. On October 2, 2009, Mr. Peters noted that Mr. Ledbetter continued to be depressed and anxious. Notes by the registered nurse indicate that Mr. Ledbetter stated his last drink had been June 20, 2009. During this period, Mr. Ledbetter also had trouble finding a medication that worked for him, reporting that the Vistaril that had been prescribed made him shaky. He was prescribed Librium and Cymbalta.

On October 12, 2009, Mr. Peters noted that Mr. Ledbetter was sober and not in recovery, but had refused to attend AA meetings. Mr. Ledbetter agreed he has "dry drunk symptoms," and informed Mr. Peters he would think about going to AA.

## B.     Claimant's Testimony

During his hearing on January 22, 2010, Mr. Ledbetter testified that he is unable to work due to depression, anxiety, and stress. He also stated he is prevented from pursuing his previous employment as a welder due to lower back pain that prevents him from being able to lift heavy weight. He reported taking pain medication Flexeril and Gabapentin, but that the side effects make him drowsy and trigger his depression. He also testified to having social anxiety that makes him feel claustrophobic and start to "flip

8

out" when around other people.  [TR-29].  He reported mood swings, stating, "I'll just go from being low down and depressed and just snap and turn around and just be real mean and hateful."  [TR-30].  Mr. Ledbetter also testified he had been sober for six months, since June of 2009, and that he had been attending AA meetings.  He testified that his depression and anxiety had not improved since he stopped drinking.

### C.    Opinions of Nontreating Sources

Medical consultant Dr. Denise Trowbridge reviewed Mr. Ledbetter's medical records but did not examine Mr. Ledbetter.  Dr. Trowbridge assessed Mr. Ledbetter's Residual Functional Capacity ("RFC") on September 8, 2008.  She concluded that Mr. Ledbetter could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand or walk for six hours of an eight hour day; sit for six hours of an eight hour day; and never climb ladders, ropes, or scaffolds.  Mr. Ledbetter should avoid heights and hazards and concentrated exposure to extreme heat, fumes, odors, etc.  She expressed the opinion that Mr. Ledbetter could do "at least light work if not more."  [TR-371].

Medical consultant Dr. Geoffrey Sutton also reviewed Mr. Ledbetter's medical records but did not examine Mr. Ledbetter.  Dr. Sutton completed a psychiatric review technique evaluation for Mr. Ledbetter on September 17, 2008.  He noted that Mr. Ledbetter suffered from the severe impairments of major depressive disorder, generalized anxiety disorder, and substance addiction.  He noted that Mr. Ledbetter's impairments were severe but not expected to last 12 months.  He stated that with treatment compliance, therapy, and abstinence, Mr. Ledbetter "should be capable of performing lsls work with limited public contact by 6/09."  [TR-382].  Dr. Sutton determined that Mr.

9

Ledbetter had moderate difficulties with social functioning and interaction; remembering and carrying out detailed instructions; and accepting criticism from supervisors.

Medical consultant Dr. Amber Elway conducted a physical examination of Mr. Ledbetter and reviewed his medical records on February 24, 2009. She diagnosed Mr. Ledbetter with thyroid cancer, hypertension, and depression. Dr. Elway checked a box on the disability review form stating that Mr. Ledbetter was temporarily disabled beginning on February 4, 2009, and expected to last until February 25, 2010.

### D. Statement of Claimant's Mother

Mr. Ledbetter's mother, Ms. Mary Ledbetter, submitted a third party statement regarding her son's disability claim on July 6, 2008. Ms. Ledbetter attested that her son "vomits if eats, has chills & fever, usually stays in bed, due to weakness & joint pains, headaches, depression, blurred vision & disorientation." [TR-245]. She stated that Mr. Ledbetter has to be told to bathe, put on clothes, shave, eat, brush his teeth, and take his medicine. She stated that she cuts his hair, makes his meals, does his laundry, and takes him to the doctor. Mr. Ledbetter does no household chores, but occasionally mows the lawn. She attested that Mr. Ledbetter "can't walk straight," and is "shakey, nervous, aggitated [sic]." [TR-248]. She wrote that he has trouble getting along with others: "he is angry at everyone and everything…. He gets out of control & beligerant with others [sic]…. He does not get along with authority figures at all. He wants to fight with everyone." [TR-249-50].

### E. ALJ's Decision

The ALJ determined that Mr. Ledbetter had the following severe impairments: history of thyroid cancer; hypertension; left ventricular hypertrophy; major depression; generalized anxiety disorders; and alcoholism. The ALJ further found that Mr. Ledbetter's impairments, coupled with his substance abuse, met Listing 12.09(B). However, the ALJ also determined that Mr. Ledbetter's mental impairments, exclusive of his substance abuse disorder, did not meet Listing 12.04 or 12.06. He concluded that Mr. Ledbetter's "recent purported cessation from substance abuse was too recent to be of note." [TR-16]. He further determined that if Mr. Ledbetter stopped alcohol abuse, his remaining mental limitations would cause more than a minimal impact on Mr. Ledbetter's ability to perform basic work activities and so would still be considered a severe impairment; however, this impairment would not meet or equal the criteria of Listing 12.04, 12.06, or 12.09. He found that if substance abuse was stopped, Mr. Ledbetter would have no restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration. The ALJ determined that if Mr. Ledbetter stopped alcohol abuse, he would have the Residual Functional Capacity ("RFC") to perform the full range of light work, with the exception that he should have no public interaction. The ALJ determined that Mr. Ledbetter's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with this RFC. The ALJ concluded that because Mr. Ledbetter would not be disabled if he stopped alcohol abuse, the substance abuse is a contributing factor material to the determination of disability, and so Mr. Ledbetter is not disabled within the meaning of the Social Security Act. The ALJ further concluded that

11

if Mr. Ledbetter stopped substance abuse, he would be unable to perform his past relevant work as a welder, but that there were other jobs in the national economy that Mr. Ledbetter could perform, including electronic assembler, bench assembler, and parking lot attendant.

## II. Discussion

### A. Legal Standard

To establish disability, a claimant must prove that he is unable to engage in substantial gainful activity by reason of a medically determinable impairment that has lasted or can be expected to last for a continuous period of 12 months or more. *See* 42 U.S.C. § 423(d). In reviewing the Commissioner's denial of benefits, the Court considers whether the ALJ's decision "is supported by substantial evidence in the record as a whole." *Muncy v. Apfel*, 247 F.3d 728, 730 (8th Cir. 2001); *see also Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence" is less than a preponderance, but must be sufficient for a reasonable mind to find it adequate to support the conclusion. *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004); *see also Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). The Court must consider evidence that detracts from as well as supports the ALJ's decision. *Black v. Apfel*, 143 F.3d 383, 385 (8th Cir. 1998). If the substantial evidence makes it equally possible to form two opposite conclusions, one of which accords with the ALJ's findings, the Court is obligated to affirm the ALJ's decision. *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996); *see also Finch*, 547 F.3d at 935; *Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007).

12

**B.       Disability Assessment**

A claim of disability is assessed via a five-step sequential evaluation. 20 C.F.R. §
404.1520(d) (2012). The ALJ first asks 1) whether the claimant has engaged in
substantial gainful activity since the alleged onslaught of her disability; 2) whether the
claimant has a severe impairment(s) that limits her ability to engage in basic work
activity; and 3) whether her impairment(s) meets or equals the listing of impairments
promulgated by the Social Security Administration ("SSA"). If the ALJ finds that the
impairment meets or equals one of the listed impairments, the claimant is conclusively
presumed disabled. If the impairment(s) does not meet or equal the listings, the ALJ asks
4) whether the claimant has shown that her impairment(s) prevents her from performing
her previous employment. If the claimant can show this, the burden shifts to the
Commissioner to show 5) that there is other work available in the national economy that
the claimant could perform. *Id*; see also *Bowen v. Yuckert*, 482 U.S. 137, 141-42, 107 S.
Ct. 2287, 2291 (1987); *Fastner v. Barnhart*, 324 F.3d 981, 983-84 (8th Cir. 2003).

Congress has eliminated alcoholism or drug addiction as a basis for obtaining
Social Security benefits. Pub.L. No. 104-121, 110 Stat. 852-56 (1996). *See also*
*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). Where the claimant suffers from a
drug or alcohol addition, the Social Security regulations prohibit a finding of disability
where the substance abuse would be "a contributing factor material to the
Commissioner's determination that the individual is disabled." 42 U.S.C.
§§423(d)(2)(C). The key question used to determine whether the substance addiction is a
contributing factor material to the determination of disability is whether the claimant

would still be disabled if she stopped using drugs or alcohol. *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000); 20 C.F.R. § 416.935(b)(2). The ALJ first uses the sequential evaluation process outlined above to determine whether the claimant is disabled, including the effects of substance abuse. "The ALJ must base this disability determination on substantial evidence of [claimant's] medical limitations without deductions for the assumed effects of substance use disorders. The inquiry here concerns strictly symptoms, not causes…." *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003). If the ALJ finds that the claimant is disabled when substance abuse is taken into account, the ALJ then asks whether the claimant would still be disabled excluding the effects of abuse. *Pettit*, 218 F.3d at 903. The ALJ "must develop a full and fair record and support his conclusion with substantial evidence on this point." *Brueggemann*, 348 F.3d 695. The claimant "carries the burden of proving her substance abuse is not a contributing factor material to the claimed disability." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002). "If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow." *Brueggemann*, 348 F.3d at 693.

B.     **Application**

1.     ***Whether substance abuse was a contributing factor***

The ALJ determined that Mr. Ledbetter would be considered disabled if his alcohol abuse were taken into account. He then determined that excluding the effects of

14

such abuse, Mr. Ledbetter would not be disabled.  This conclusion is supported by substantial evidence in the record.

Mr. Ledbetter contends that there is no medical evidence in the record that alcohol was a material contributing factor to his disability or that his impairments would resolve if he stopped using alcohol.  He argues that since the ALJ did not have sufficient evidence to assess materiality, his burden was met and disability should have been awarded.  *See Kluesner*, 607 F.3d at 537 ("on the materiality of his [substance] abuse, a tie would go to" the claimant).

As laid out above, Mr. Ledbetter's treating physicians and therapists routinely diagnosed Mr. Ledbetter with alcohol dependency in addition to depression and anxiety.  Even in periods of sobriety, his treating sources continually recommended that Mr. Ledbetter attend AA meetings, and noted in their records that Mr. Ledbetter "lacked insight" regarding his alcohol dependency.  There is thus sufficient medical evidence in the record on which the ALJ could base his decision that alcohol was a material contributing factor to Mr. Ledbetter's impairments.

Mr. Ledbetter has not carried his burden of proving that alcohol was not a material contributing factor to his impairments.  He focuses on his various GAF assessments as indications that his mental impairments are such that even in periods of sobriety he would be unable to work.  Mr. Ledbetter was diagnosed with a GAF of 40 in June 2008, 55 in July 2008, and 50 in August 2009.  A GAF score of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life." *Brueggemann*, 348 F.3d at 695.  The Tenth Circuit has stated that a GAF score of 50 or less suggests an inability to

keep a job. *Oslin v. Barnhart*, 69 F. App'x 942, 947 (10th Cir. 2003). However, Mr. Ledbetter was assessed at a GAF score of 40 after he had reported trying to "drink himself to death," which indicates alcohol abuse was a factor in the therapist's assessment. A month later, after Mr. Ledbetter had been sober for a month, his treating physician Dr. Mahmood assessed his GAF at 55. A year later, Mr. Ledbetter's treating therapist assessed his GAF at 50, after Mr. Ledbetter reported that he had gotten drunk two months previously and been charged with disorderly conduct; the therapist diagnosed Mr. Ledbetter with mood disorder, anxiety disorder, and alcohol dependence. It is clear from the reports of the treating sources that Mr. Ledbetter's low GAF scores were influenced by his alcohol abuse.

Mr. Ledbetter also argues that his alcohol abuse was not a material contributing factor because he continued to report symptoms of depression and anxiety even in periods of sobriety. However, his treating therapist, Dr. Joyce Arnold, continuously recommended that Mr. Ledbetter look for a job, noting in her records that one component of his depression and anxiety was his concern at being unemployed and dependent on his mother. Dr. Arnold's regular reiteration of this recommendation indicates that she did not consider Mr. Ledbetter's mental illness in periods of sobriety so disabling that it would prevent him from working.

The medical record therefore supports the ALJ's decision that alcohol abuse was a material contributing factor to Mr. Ledbetter's impairments, and that minus such abuse his impairments would not rise to the level of a disability.

### 2.    *Third Party Testimony*

Mr. Ledbetter also argues that the ALJ failed to consider the third party statement of his mother, Ms. Mary Ledbetter. The ALJ did not explicitly mention Ms. Ledbetter's statement in his determination. The Eighth Circuit has held that "[w]hile it is preferable that the ALJ delineate the specific credibility determinations for each witness, an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992) (internal quotes omitted). Here, Ms. Ledbetter's statement accords with Mr. Ledbetter's testimony and the treating physicians' assessment of Mr. Ledbetter's depression, anxiety, and anti-social behavior. The ALJ has determined that Mr. Ledbetter would be disabled if his alcohol abuse were taken into account, and this determination is not in conflict with Ms. Ledbetter's statement. However, there is no indication in Ms. Ledbetter's statement that she believes her son's limitations would remain absent his alcohol abuse, and so it is ultimately not instructive on the question of whether Mr. Ledbetter's impairments would be disabling notwithstanding his alcoholism. The ALJ's failure to discuss Ms. Ledbetter's opinion thus has no bearing on the outcome of the case.

Additionally, where "third-party evidence supporting a claimant's complaints was the same as evidence that the ALJ rejected for reasons specified in the opinion," the ALJ's failure to explicitly address the third party evidence did not justify remand. *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008); *see also Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011); *Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995). The ALJ found that Mr. Ledbetter's claimed exertional limitations were "somewhat

17

exaggerated" and not credible. Although the ALJ must seriously consider allegations of subjective pain, *Finch*, 547 F.3d at 935, he may reject the claimant's complaints where there are "inconsistencies in the record" as a whole. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004); *see also Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

The ALJ found that Mr. Ledbetter's subjective allegations of his limitations were not credible. He concluded that Mr. Ledbetter's mental impairments would not restrict his activities of daily living if substance abuse was stopped, basing this assessment on Mr. Ledbetter's testimony at the hearing that he was living with friends and his statements that he occasionally mowed the lawn for his mother and played on the computer. This finding is in contradiction to Ms. Ledbetter's assertion that Mr. Ledbetter needed her help with daily living activities. Notably, at the time of his hearing, Mr. Ledbetter was no longer living with his mother. Additionally, although the ALJ did not mention this point, Mr. Ledbetter's therapist, Dr. Arnold, recorded that Ms. Ledbetter persistently pressured her son to "get a job and help around the house," which belies Ms. Ledbetter's statement that her son was incapable of doing chores or working. Because the ALJ found Mr. Ledbetter's claimed limitation regarding daily life activities not credible, he was justified in disregarding Ms. Ledbetter's statement.

### 3. *Weight Given to Medical Opinions*

Mr. Ledbetter contends that the ALJ failed to assign sufficient weight to the medical opinions of record. A treating physician's opinion is generally entitled to "controlling weight," provided it is consistent with the medical record and not called into

18

question by more thorough medical evidence.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000); *see also Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008); *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.1997); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The ALJ must "always give good reasons for the particular weight given to a treating physician's evaluation."  *Prosch*, 201 F.3d at 1013 (internal quotes omitted).  "Typically, medical opinions from treating sources are entitled to greater weight than are medical opinions from consultative sources."  *Owen*, 551 F.3d at 798.  "[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."  *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (internal quotes omitted); *see also Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003) ("the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision.").

Mr. Ledbetter contends that the ALJ improperly dismissed the opinions of the treating physicians.  Mr. Ledbetter points to the statement by his therapist, Dr. Joyce Arnold, who stated in August 2008 that "[a]t this time it would be difficult for him to keep a job" because of his difficulty interacting with others.  [TR-364].  However, regardless of this statement, Dr. Arnold continued to recommend that Mr. Ledbetter look for at least part-time work, as discussed above, and at her last session stated that Mr. Ledbetter had "moderately improved" because he currently expressed a desire to find employment.  Furthermore, although the ALJ did not reference Dr. Arnold by name, it is clear the ALJ relied on her opinion and the opinions of other treating sources in arriving at his determination.  He stated expressly that "[a]s for the opinion evidence, that of the

medical staff at Johnson County Mental Health Center appears to be frank, open and rather professional." He goes on to describe generally Mr. Ledbetter's complaints during therapy, and states "much weight is given to these observations and findings." [TR-16]. The record of these treating sources supports the ALJ's findings that Mr. Ledbetter's alcohol abuse was a contributing factor to his disability and that absent alcoholism, Mr. Ledbetter would not be considered disabled.

Mr. Ledbetter also contends that the ALJ did not mention the opinion of Dr. Amber Elway, a consulting physician who conducted a physical examination of Mr. Ledbetter for a disability review in February 2009. She checked a box on the disability form stating that Mr. Ledbetter was temporarily disabled beginning February 4, 2009, expected to last until February 25, 2010. However, Dr. Elway did not offer any explanation for this finding. As noted above, the opinions of nontreating sources are not given the same amount of weight as treating sources. Additionally, even if Dr. Ellway were a treating physician, where an opinion of a treating source "consists of… checklist forms, cites no medical evidence, and provides little to no elaboration," it is conclusory and not entitled to controlling weight. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010). Furthermore, even were the ALJ to grant significant weight to Dr. Ellway's opinion, it would not change the outcome of his decision; the ALJ agreed that Mr. Ledbetter was considered disabled when his alcoholism was taken into account, but found that there was insufficient evidence in the record that Mr. Ledbetter would still be disabled even absent his alcohol abuse. Dr. Elway's opinion does not address whether or not Mr. Ledbetter would be disabled absent alcoholism.

20

Mr. Ledbetter also contends that the ALJ did not describe the weight he assigned to the opinion of non-examining, non-treating sources, Dr. Geoffrey Sutton and Dr. Denise Trowbridge. However, the ALJ in fact directly referenced the opinions of Dr. Sutton and Dr. Trowbridge, stating, "as Dr. Sutton noted, with continued treatment compliance, therapy and abstinence, the claimant should be capable of performing his work with limited public contact." The ALJ also stated that Dr. Trowbridge's opinion, in which she reviewed Mr. Ledbetter's record and assessed his RFC, was consistent with the ALJ's findings as to Mr. Ledbetter's ability to work. It is true that the ALJ did not explicitly say how much weight he gave to either opinion or address every element of the opinions. However, as discussed above, the opinions of non-treating sources like Dr. Sutton and Dr. Trowbridge are not entitled to great weight. The ALJ referenced the opinion of these doctors in support of his findings of Mr. Ledbetter's RFC, which he based on the records of the treating sources. An ALJ may credit the assessment of a nontreating physician where it is generally consistent with the record of the treating physicians. *See Jenkins*, 196 F.3d at 924.

With regards to the opinions of the consulting physicians Drs. Ellway, Sutton, and Trowbridge, it would have been preferable if the ALJ had "delineated the specific credibility determinations" granted each; yet, as mentioned above, "arguable deficiencies in opinion-writing" can be overlooked when the end result is supported by the record. *See Robinson*, 956 F.2d at 841. As such, the ALJ's decision to support his determination by references to the opinions of nontreating sources, which were consistent with those of Mr. Ledbetter's treating physicians, was proper.

21

## 4.      *Whether the ALJ Properly Calculated the RFC*

Residual Functional Capacity ("RFC") is defined as "the most a claimant can still do despite his or her physical or mental limitations." *Masterson*, 363 F.3d at 737 (internal quotes omitted). A claimant's RFC is assessed based on the totality of the relevant evidence in the case record, "including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations." *Id*. The ALJ determined that if Mr. Ledbetter stopped alcohol abuse, he would have the RFC to perform the full range of light work, with the exception that he should have no public interaction and avoid hazards and extreme conditions. In making this determination, the ALJ relied on the physical assessment of nontreating, non-examining physician Dr. Trowbridge. As discussed above, Dr. Trowbridge's assessment was consistent with the opinions of Mr. Ledbetter's treating sources. The ALJ adopted Dr. Trowbridge's physical RFC limitations, stating that there was minimal evidence in the record of Mr. Ledbetter's physical impairments that existed apart from his alcoholism. As the medical record laid out above reveals, there is substantial evidence to support this RFC determination.

Mr. Ledbetter argues that the ALJ should have included in the RFC the opinion of nontreating, non-examining physician Dr. Sutton that he was limited to "lsls" (low skilled, low stress) jobs, and that in addition to problems with social interaction, Mr. Ledbetter was also limited in getting along with supervisors and co-workers. Firstly, as discussed above, Dr. Sutton is a nontreating source, and so his opinion is not entitled to controlling weight. The elements of Dr. Sutton's opinion that the ALJ chose to

22

emphasize are consistent with the opinions in the medical record of Mr. Ledbetter's treating physicians and therapists.

Secondly, "[t]he hypothetical question need only include those impairments and limitations found credible by the ALJ." *Gragg v. Astrue*, 615 F.3d 932, 940 (8th Cir. 2010). As discussed above, the ALJ concluded that some of the limiting effects alleged by Mr. Ledbetter were not credible. This determination is supported by statements by Mr. Ledbetter's treating physicians. For instance, treating physician Dr. Mahmood expressed the opinion that Mr. Ledbetter had "somewhat grandiose ideation," while Dr. Arnold wrote that Mr. Ledbetter engaged in self-limiting behavior, stating that he "is fearful of looking for a job as he is afraid he will not be able to keep it." Treating therapist Mr. Peters also reported that Mr. Ledbetter "lacked insight" into his alcohol abuse. This evidence by treating sources is sufficient basis for the ALJ's decision that certain of Mr. Ledbetter's claims about his limitations are not credible.

Finally, the ALJ did in fact include most of these restrictions or their equivalents in the RFC hypothetical he posed to the vocational expert. He stated that hypothetically,

> I find the claimant could perform a limited range of light work and the limitations on that light work would be as follows: first, a moderate limitation in social function, which I'm going to define as precluding work for which interaction with the public would be a primary job component. Secondly, a moderate limitation in the ability to concentrate such that the claimant would not be able to perform semi-skilled and skilled work activity. And thirdly, a moderate limitation in ability to perform activities of daily living, and I am going to translate that as meaning that the claimant may miss up to one day of work per month.

[TR-35]. As is clear from this hypothetical, the ALJ incorporated much of Dr. Sutton's opinion, as well as the opinions of Mr. Ledbetter's treating physicians, into his

assessment of Mr. Ledbetter's RFC. The RFC determination was thus based on substantial evidence in the record. Where the hypothetical is adequate, the vocational expert's testimony is reliable. *Gragg*, 615 F.3d at 941. In response to this hypothetical, the vocational expert attested that there were sufficient jobs in the national economy that Mr. Ledbetter could perform.

Mr. Ledbetter argues that in his decision, the ALJ framed his RFC determination as relying on the Medical-Vocational Guidelines. 20 C.F.R. Pt. 404, Subpt. P, App. 2. Where the claimant's impairment is mentally as well as physically limiting, reliance solely on the Medical-Vocational Guidelines to determine the RFC is improper; rather, an ALJ must consult a vocational expert to determine the RFC of a claimant who suffers from a severe mental impairment. *Brock v. Astrue*, 674 F.3d 1062, 1066 (8th Cir. 2012). Here, although the ALJ noted that his RFC determination was consistent with the Medical-Vocational Guidelines, he ultimately referenced and relied on the testimony of the vocational expert, stating, "The Vocational Expert suggested a series of light jobs that the claimant can perform," including electronic assembler, bench assembler, and parking lot attendant. The ALJ's conclusion that there were sufficient jobs in the national economy that Mr. Ledbetter could perform was therefore proper.

## III.    Conclusion

The Social Security regulations authorize the district court to affirm, modify, or reverse the Commissioner's decision. 42 U.S.C. § 405(g). Because the Court finds that the ALJ's denial of benefits was based on substantial evidence in the record, the decision is AFFIRMED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: December 10, 2012
Jefferson City, Missouri